**S. D. HICKS & SON COMPANY,**
Plaintiff-Appellee,

v.

**J. T. BAKER CHEMICAL CO.,**
Defendant-Appellant.

No. 383, Docket 27416.

United States Court of Appeals
Second Circuit.

Argued June 12, 1962.

Decided Sept. 12, 1962.

Daniel H. Greenberg, New York City (Samuel Mezansky and Herman Mendes, New York City, on the brief), for plaintiff-appellee.

Edward J. Behrens of Gay & Behrens, New York City, for defendant-appellant.

Before FRIENDLY, KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Defendant appeals from the decision of the court below which awarded plaintiff judgment for over $54,000, of which over $24,000 represents interest, in its action for unpaid compensation for the construction of a chemical processing plant pursuant to a contract between the parties, and which dismissed Baker's counterclaim for damages attributable to

delays in performance. The diverse citizenship of the parties provides the basis of federal jurisdiction. 28 U.S.C. § 1332. Since the contract was made in New York and contemplated performance there, the law of New York applies. See Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954).

Prior to the contract in suit, Baker, a manufacturer of carbon disulphide, produced that product in its chemically pure state by a multistage "batch" method— a method that necessitated the shipment of impure chemical disulphide from the plant in which it was produced to a plant several hundred miles away, where the impurity (water) was removed. The dealings between the parties grew out of Baker's desire to have a single processing unit that would continuously produce chemically pure carbon disulphide. The contract involved the construction of such a plant by Hicks. A plant of this type had never before been operated and the agreement between the parties followed an extended period of joint research and consultation designed to determine the feasibility of the project and thereafter to draft specific plans for the system. During this time, Baker consulted its own expert and did significant independent research.

On January 17, 1946, Hicks submitted to Baker a proposal and specifications for the construction of a suitable plant which directly incorporated the work and study of both parties. After some intermediate correspondence involving an initial acceptance and certain changes by mutual consent, Baker accepted Hicks' offer by a purchase order dated May 14, 1946. Incorporated therein was a guarantee that "[w]hen supplied with the necessary utilities and crude Carbon Disulphide feed, the unit shall be guaranteed to produce a finished product [at the rate of 90,000 pounds per day], meeting C. P. [chemically pure] as established by the American Chemical Society."

During the ensuing months there was a further effort on the part of both of the parties to perfect the plans for the new plant. On August 30, 1946, the parties conferred on certain questions concerning the meaning of the contract and the plans for its performance. A document emerged, referred to by the parties as "the contract interpretation," which, it was agreed, would constitute part of the written contract. This document did not relieve Hicks from the obligations Hicks had undertaken, and, indeed, as far as is material here, it reaffirmed Hicks' basic obligation as reflected in the guarantee of May 14.

■ During the period of fabrication and installation, Baker kept in constant touch with Hicks and continued from time to time to indicate approval or disapproval of aspects of the plans. A number of changes and additions were ordered as the work progressed. One of the issues in suit is Hicks' demand for separate compensation for the reasonable value of items not included in the original specifications but later ordered by Baker. The trial judge carefully appraised the items claimed and allowed Hicks recovery for "extras" in the amount of $4,289.74, plus interest, considerably less than the amount which Hicks claimed. There is no doubt that Baker is required to pay for these items, see High Quality Homes, Inc. v. Palmer, 283 App.Div. 954, 130 N.Y.S.2d 360 (2d Dept. 1954); Keahon Bros., Inc. v. Blank, 161 Misc. 874, 292 N.Y.S. 257 (County Ct. 1936), and the findings of the lower court as to the "extras" are supported by uncontradicted evidence. On this point, the judgment is affirmed.

Beginning in August, 1947, the new equipment was subjected to a number of test runs which established that the plant would not operate successfully to secure the result guaranteed by the contract. Hicks continued to make changes and corrections in the original design and successful operation was finally achieved in August, 1948.

The trial court granted most of Hicks' claims for payment for the expense of the corrections and additions which were found necessary during the course of the

test runs to put the plant in operable condition and to achieve the guaranteed performance. The theory on which such recovery was predicated was apparently that the reliance on Hicks' guarantee was abandoned by the parties and the construction of the plant became a kind of joint venture.[1] The trial judge held that the payment to plaintiff of a larger amount than that provided by the original contract was "unexplained" if defendant was relying on the contractual guarantee and that if defendant expected its liability to be limited by the guarantee "it should have cast plaintiff out of its premises" when the test runs failed.

■ We do not agree. Even if payment by the defendant of an amount in excess of the contract price could be held to justify the requirement that it pay even more, the additional payments are readily explained by the contract provision for "escalation," i. e. increase in defendant's obligation where increased expense was caused by rising prices for materials, and by defendant's payments for "extras" which it had ordered. Moreover, there is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon performance at the due date and by urging and encouraging the other party to perform thereafter. Cassidy v. Le Fevre, 45 N.Y. 562 (1871); see General Supply & Const. Co. v. Goelet, 241 N.Y. 28, 148 N.E. 778 (1925); 5 Williston, Contracts § 700 (Jaeger Ed. 1961).

■ While we must reverse because plaintiff was permitted to recover for expenses of correcting defects in its design in order to put the plant into successful operating condition, we cannot be certain from the trial court's findings that the entire amount of plaintiff's recovery for the period after failure of the first tests is unjustified. Under the contract the plaintiff's guarantee of performance was conditioned upon the defendant's providing an adequate supply of pure water. During the first tests the water was not pure and some of plaintiff's additional expense may have been caused by the deficiency in the water. Moreover, there may have been additional "extras" which are not separately treated in the trial court's findings.

■ There is one further item on which we disagree with the conclusion of the trial judge. Hicks was awarded $3,463.03 plus interest as "escalation" on the construction of the building (as opposed to the construction or installation of the unit). The contract clause relating to "escalation" is as follows:

"The prices quoted herein are based upon present prices of the component materials, and present labor rates applicable to the fabrication, and are subject to adjustment at the time of shipment to the extent of any changes in such material, prices, and/or labor rates."

There is considerable doubt whether the evidence of increased building costs is sufficiently substantial to justify, as a factual matter, the award of this amount, but without reaching that question, we conclude that the construction of the building was not intended to be covered by the escalation clause. The clause speaks of readjustment at "the time of shipment" and since it was agreed that the building would be constructed directly on Baker's property, a time of shipment as regards the building could not have been contemplated. Furthermore, since the parties expected that the building would be complete only six weeks after the contract date, it is not probable that costs would be expected to rise substantially in that period or that measures to insure against that possibility would be included. We would therefore deny recovery for escalation on the building and the accompanying interest.

1. "The entire record is persuasive of a claim (no matter in how many counts pleaded) of a single transaction between the parties, each to contribute in his special field toward the joint creation of a new process for producing CPCS2."

The findings of the trial court leave us in doubt as to the proper disposition of the defendant's counterclaim in the light of our holding. It may well be that dismissal of the counterclaim was proper, not because, as the trial court thought, the project became a joint venture, but because by ordering changes and additions in the specifications and by failing to furnish an adequate supply of pure water the defendant made it difficult or impossible for plaintiff to perform within the time limited by the guarantee. We express no opinion on this issue and leave it for reconsideration by the trial court.

Affirmed in part, reversed and remanded in part to the trial court for further proceedings not inconsistent with this opinion.