Matter of National Fuel Gas Supply Corp. v Schueckler (2018 NY Slip Op 07550)





Matter of National Fuel Gas Supply Corp. v Schueckler


2018 NY Slip Op 07550


Decided on November 9, 2018


Appellate Division, Fourth Department


NeMoyer, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 9, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CARNI, J.P., LINDLEY, NEMOYER, CURRAN, AND WINSLOW, JJ.


725 CA 17-02021

[*1]IN THE MATTER OF NATIONAL FUEL GAS SUPPLY CORPORATION, PETITIONER-RESPONDENT,
v
JOSEPH A. SCHUECKLER, THERESA F. SCHUECKLER, RESPONDENTS-APPELLANTS, ET AL., RESPONDENTS. 






LAW OFFICE OF GARY A. ABRAHAM, GREAT VALLEY (GARY A. ABRAHAM OF COUNSEL), FOR RESPONDENTS-APPELLANTS.
PHILLIPS LYTLE LLP, BUFFALO (CRAIG A. LESLIE OF COUNSEL), FOR PETITIONER-RESPONDENT. 


NeMoyer, J.
 Appeal from an order of the Supreme Court, Allegany County (Thomas P. Brown, A.J.), entered June 28, 2017. The order, inter alia, granted the petition for the acquisition of easements. 
It is hereby ORDERED that the order so appealed from is reversed on the law without costs and the petition is dismissed.
Opinion by NeMoyer, J.:
Petitioner National Fuel Gas Supply Corporation wants to build an interstate gas pipeline that would run, in part, across the land of Joseph A. Schueckler and Theresa F. Schueckler (respondents). The State of New York, however, has blocked the entire pipeline project by denying petitioner the necessary environmental permits. Notwithstanding the barrier posed by the State's regulatory action, petitioner still seeks to acquire easements over respondents' land by eminent domain. This appeal therefore presents a novel question of condemnation law: can a corporation involuntarily expropriate privately-owned land when the underlying public project cannot be lawfully constructed? We answer that question firmly in the negative.
I
This case lies at the intersection of federal law governing interstate pipeline construction and state law governing eminent domain procedure. In order to properly contextualize the underlying facts and the parties' arguments, we will first sketch out the applicable statutory framework.
A. Federal Interstate Pipeline Construction Law
The regulatory process for constructing a natural gas pipeline across state lines is spelled out in the federal Natural Gas Act (NGA) (15 USC § 717 et seq.). Under the NGA, a company wishing to construct such a pipeline must apply for a "certificate of public convenience and necessity" (certificate) from the Federal Energy Regulatory Commission (FERC) (15 USC § 717f [c], [d]). Following the necessary review and public hearing, "the application shall be decided in accordance with the procedure provided in subsection (e) of [section 717f] and such certificate shall be issued or denied accordingly"
(§ 717f [c] [1] [B]).
Subsection (e) of section 717f, in turn, says as follows:
"a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the . . . construction . . . covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of [the NGA] and the requirements, rules, and regulations of the [FERC] thereunder, and that the proposed . . . construction . . . , to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The [FERC] shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."
The import of a valid and effective certificate cannot be overstated in this context, for the NGA explicitly provides that "[n]o natural-gas company . . . shall . . . undertake the construction or extension of any [pipeline] facilities . . . unless there is in force . . . a certificate of public convenience and necessity issued by the [FERC] authorizing such acts" (15 USC § 717f [c] [1] [A] [emphasis added]).
In exercising its power conferred by section 717f (e) to condition a certificate "[i]n conjunction with the . . . review of a natural gas project application, [the FERC] must ensure that the project complies with the requirements of all relevant federal laws, including . . . the Clean Water Act (CWA) [33 USC § 1251 et seq.]" (Islander E. Pipeline Co., LLC v Connecticut Dept. of Envtl. Protection, 482 F3d 79, 84 [2d Cir 2006]). Insofar as relevant here, the CWA obligates "[a]ny applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters" — such as the construction of an interstate natural gas pipeline — to obtain a water quality certification (WQC) from each affected State (33 USC § 1341 [a] [1]). If a WQC is granted, the affected State certifies that the pipeline will be built and operated in a manner that complies with the CWA's "effluent limitations and other pollutant control requirements, including state-administered water quality standards" (Delaware Riverkeeper Network v Federal Energy Regulatory Commn., 857 F3d 388, 393 [DC Cir 2017]).
Critically, however, the CWA provides that "[n]o license or permit shall be granted if [a WQC] has been denied by the State" (33 USC § 1341 [a] [1]). It therefore follows that, given the requirements of both the NGA (15 USC § 717f [e]) and the CWA (33 USC
§ 1341 [a] [1]), the FERC must condition the construction of an interstate natural gas pipeline upon the issuance of a WQC by each affected State (see Delaware Riverkeeper Network, 857 F3d at 397-399; see generally Islander E. Pipeline Co., LLC, 482 F3d at 84). Indeed, the DC Circuit has strongly implied that the FERC's failure to impose such a condition would effectively render the certificate void (see Delaware Riverkeeper Network, 857 F3d at 399).
B. State Eminent Domain Law
When a "corporation is unable to agree for the purchase of any real property required for the [construction of a pipeline], it shall have the right to acquire title thereto by condemnation" (Transportation Corporations Law § 83; see generally Iroquois Gas Corp. v Jurek, 30 AD2d 83, 84-89 [4th Dept 1968])[FN1]. A "two-step process" for any such condemnation is set out in [*2]the Eminent Domain Procedure Law (Matter of City of New York [Grand Lafayette Props. LLC], 6 NY3d 540, 543 [2006]). "First, under EDPL article 2, the condemnor must make a determination to condemn the property either by using the hearing and findings procedures of EDPL 203 and 204 or by following an alternative procedure permitted by EDPL 206" (id.). "Second, pursuant to EDPL article 4, the condemnor must seek the transfer of title to the property by commencing a judicial proceeding known as a vesting proceeding" (id.). When a condemnor invokes an alternative procedure authorized by EDPL 206 (i.e., an exemption from the standard condemnation procedure of EDPL 203 and 204), the condemnee may obtain judicial review of the condemnor's entitlement to an EDPL 206 exemption by raising the issue in its answer to the condemnor's EDPL article 4 vesting petition (see Matter of Rockland County Sewer Dist. No. 1 v J. & J. Dodge, 213 AD2d 409, 410 [2d Dept 1995]; Matter of Town of Coxsackie v Dernier, 105 AD2d 966, 966-967 [3d Dept 1984]; see e.g. Matter of Eagle Cr. Land Resources, LLC v Woodstone Lake Dev., LLC, 108 AD3d 71, 74-78 [3d Dept 2013]; Matter of Sanitation Garage Brooklyn Dists. 3 & 3A, 32 AD3d 1031, 1034-1035 [2d Dept 2006], lv denied 7 NY3d 921 [2006]).
"The main purpose of article 2 of the EDPL" — the first step of the eminent domain process — "is to ensure that an appropriate public purpose underlies any condemnation" (City of New York, 6 NY3d at 546; see EDPL 204 [B] [enumerating factors relevant to the public purpose inquiry]). The alternative procedures permitted by EDPL 206 are not designed to obviate the condemnor's obligation to demonstrate that the condemned land will be put to public use. Nor could they, for the existence of a "public use" for condemned property is indispensable to any constitutional exercise of the eminent domain power (NY Const, art I, § 7 [a]; see generally Matter of Goldstein v New York State Urban Dev. Corp., 13 NY3d 511, 546-552 [2009, Smith, J., dissenting] [discussing background and history of the "public use" requirement in the State Constitution's eminent domain clause]). Rather, the alternative procedures permitted by EDPL 206 simply allow the condemnor to make its public purpose showing in a different forum.
The alternative procedure relevant to this case is set forth in EDPL 206 (A). Under that provision, a condemnor is deemed "exempt from compliance from the provisions of [EDPL article 2]" when "pursuant to . . . federal . . . law or regulation it considers and submits factors similar to those enumerated in [EDPL 204 (B)] to a . . . federal agency, board or commission . . . and obtains a license, a permit, a certificate of public convenience or necessity or other similar approval from such agency, board or commission" (EDPL 206 [A]). By virtue of this exemption, the condemnor can bypass the procedural requirements of EDPL article 2 — including the paramount obligation to show a public purpose for the condemnation under EDPL 204 (B) — by obtaining a certificate of public necessity from a federal commission that weighed the risks and benefits of a project and concluded that it served a public purpose. EDPL 206 (A), in short, protects the condemnor from duplicative public purpose inquiries; it does not eliminate the condemnor's obligation to show a public purpose in the first place.
II
With the statutory background in mind, we turn now to the specifics of this case.
In February 2017, the FERC granted petitioner's application for a certificate of public convenience and necessity to construct and operate a 97-mile natural gas pipeline from Pennsylvania into western New York. The pipeline's proposed route travels directly across respondents' land in the Town of Clarksville, Allegany County. Within the voluminous [*3]certificate, the FERC found that petitioner's "proposed [pipeline] project is consistent with the Certificate Policy Statement," i.e., the public interest. "Based on this finding and the environmental review for the proposed project," the FERC further found "that the public convenience and necessity require approval and certification of the project."
The certificate, however, was not unconditional. Throughout the certificate, the FERC emphasized that the authorization conferred thereby was "subject to the conditions described [t]herein," and that the finding of public necessity was "subject to the environmental and other conditions in this order." Insofar as relevant here, the "certificate . . . authorizing [petitioner] to construct and operate the [pipeline]" was "conditioned on [petitioner's] compliance with the environmental conditions in Appendix B."
For its part, Appendix B required petitioner, before beginning construction, to "file . . . documentation that it has received all applicable authorizations required under federal law." One of the "authorizations required under federal law" is, of course, a WQC from any affected State. In short, as required by federal law (see 33 USC § 1341 [a] [1]), the FERC's authorization to build the pipeline was explicitly conditioned on, inter alia, petitioner's acquisition of a WQC from the State of New York. Petitioner filed the necessary WQC application accordingly.
In March 2017, while its WQC application was still pending in Albany, petitioner commenced the instant vesting proceeding pursuant to EDPL article 4 to acquire, by eminent domain, the easements over respondents' land necessary to construct and operate the pipeline. The petition alleges that the "public use, benefit, or purpose for which the Easements are required is to construct, install, own, operate, and maintain [the pipeline]." According to petitioner, it was "exempt from the requirements of Article 2 of the [EDPL] because [it] previously applied to the [FERC] for a Certificate of Public Convenience and Necessity for the [pipeline] Project, . . . and was granted such a certificate." Specifically, petitioner explained, "the fact that FERC granted the FERC Certificate fulfills the requirements of EDPL 206 (A), and exempts [petitioner] from the hearing requirements of EDPL Article 2." Accordingly, petitioner asked Supreme Court to authorize the involuntary taking of the necessary easements.
Shortly after petitioner commenced the vesting proceeding, however, the New York State Department of Environmental Conservation (DEC) denied petitioner's application for a WQC. The WQC application, held the DEC, "fails to demonstrate compliance with New York State water quality standards." Petitioner has taken various steps to challenge the WQC denial, including the filing of a petition for judicial review in the Second Circuit pursuant to 15 USC § 717r (d). It appears that those challenges have not yet been finally resolved. It is undisputed, however, that if the WQC denial is ultimately upheld, the pipeline cannot be built (see § 717f [c] [1] [A]; 33 USC
§ 1341 [a] [1]).[FN2]
Respondents answered the vesting petition several days after the DEC's ruling. Insofar as relevant here, respondents denied that petitioner's FERC certificate was currently effective or that such certificate satisfied "the requirements for an exemption under . . . EDPL 206." In respondents' third affirmative defense, which was structured to "further explain" their challenge to petitioner's reliance on the section 206 (A) exemption, respondents argued that petitioner's FERC certificate "has been invalidated by [DEC's] denial of a [WQC]." "Because the [WQC] has been denied, FERC's . . . Certificate must be deemed revoked by action of law," respondents continued. In short, respondents argued that petitioner was not entitled to a section 206 exemption from the general EDPL article 2 eminent domain framework because, following the DEC's denial of a WQC, petitioner no longer held a valid and operative FERC certificate.
Supreme Court ultimately granted the petition in its entirety and authorized the acquisition of the easements necessary for the construction and operation of the pipeline. In its written decision, the court first held that petitioner "has shown that FERC has issued it an order granting a certificate of public convenience for its pipeline project, exempting it from the requirements of Article 2 of the EDPL." Supreme Court also found that respondents' third affirmative defense was "without merit" because "the [WQC] condition applied to the construction of the pipeline and not to the initiation of eminent domain proceedings." The court did not elaborate on that conclusion, nor did it explain how petitioner's legal entitlement to initiate condemnation proceedings could be divorced from petitioner's legal entitlement to build the pipeline that, by its own characterization, constituted the very "public use, benefit, or purpose" for which respondents' land was ostensibly needed.
Respondents appeal, and we now reverse.
III
The main thrust of respondents' appellate arguments can be distilled to a single central point: petitioner is not exempt from EDPL article 2 because, following the State's WQC denial, petitioner no longer holds a qualifying federal certificate for purposes of the EDPL 206 (A) exemption. As respondents put it, petitioner no longer has a valid and operative "FERC Certificate that exempts the company from the burden of demonstrating [the] project's public purpose" under article 2. We agree.
Petitioner obviously did not conduct a hearing under EDPL 203 or make findings pursuant to EDPL 204. Petitioner therefore looks — as it must — to the alternative procedure permitted by EDPL 206 (A). That reliance, however, is misplaced. Although it is true that a [*4]federal commission issued a certificate of public necessity approving petitioner's pipeline project, the certificate nevertheless authorized construction of the pipeline "subject to" various conditions, including, as discussed above, the State's issuance of a WQC. " [S]ubject to' . . . language means what is says: no vested rights are created . . . prior to" the occurrence of the condition to which the instrument is subject (Moran v Erk, 11 NY3d 452, 456 [2008]). Thus, when the State denied the very permit upon which petitioner's authority to construct the pipeline was conditioned, petitioner — by definition — lost its contingent right to construct the public project that undergirds its demand for eminent domain in this proceeding (see Islander E. Pipeline Co., LLC, 482 F3d at 91 [recognizing that Connecticut's WQC denial "continues to prevent Islander East from proceeding with its FERC-approved natural gas pipeline project"]).
Accordingly, as a result of the State's WQC denial, petitioner does not currently hold a qualifying federal permit for purposes of EDPL 206 (A), i.e., a federal permit that (at a minimum) authorizes construction of the public project for which the condemnor seeks to exercise its power of eminent domain (compare e.g. Matter of County of Tompkins [Perkins], 237 AD2d 667, 668-669 [3d Dept 1997]). Without a qualifying federal permit under EDPL 206 (A), petitioner is not entitled to bypass the standard hearing and findings procedure of EDPL article 2. And because there is no dispute that petitioner did not comply with the standard procedure set forth in EDPL article 2, it has no right to proceed directly to an EDPL article 4 vesting proceeding. The article 4 vesting petition must therefore be dismissed.
Our conclusion is consistent with the WQC's key role in the federal regulatory scheme. As the United States Supreme Court wrote in S.D. Warren Co. v Maine Bd. of Envtl. Protection, the CWA "recast pre-existing law and was meant to continue the authority of the State to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State" (547 US 370, 380 [2006] [internal quotation marks, ellipsis, and brackets omitted]). Consequently, as the DC Circuit elaborated, the CWA "gives a primary role to states to block [construction] projects by imposing and enforcing water quality standards that are more stringent than applicable federal standards. . . . FERC's role is limited to awaiting, and then deferring to, the final decision of the state. Otherwise, the state's power to block the project would be meaningless" (City of Tacoma, Wash. v FERC, 460 F3d 53, 67 [DC Cir 2006] [internal quotation marks omitted]). So too here; if petitioner is allowed to continue its pursuit of eminent domain in furtherance of a project that has been lawfully blocked by the State, then "the state's power to block the project would be meaningless" (id.).
Petitioner's contrary arguments are meritless. Initially, petitioner argues throughout its brief that the WQC requirement is only a condition precedent for the construction of the pipeline, not a condition precedent of the certificate itself. And because the certificate itself does not condition petitioner's eminent domain power on the issuance of a WQC, petitioner continues, respondents cannot defend this vesting proceeding in reliance on the State's denial of the WQC. But this entire line of argument is a non sequitur. Of course the pipeline's construction is conditioned on the issuance of a WQC — that is the entire point of the certificate. The certificate has no purpose except to authorize construction of the pipeline and to set the conditions precedent for such construction, and petitioner's effort to erect a distinction between a condition precedent of the certificate and a condition precedent for construction is a semantical game with no relevance to its entitlement to an EDPL 206 (A) exemption, not to mention the property rights of respondents.
Petitioner's further attempt to cleave a distinction between a condition of the certificate's authorization of construction and a condition of its purported authorization of eminent domain is also wholly unavailing. The certificate itself is not the source of petitioner's authority to condemn, and it thus can neither authorize nor prohibit the acquisition of property by eminent domain. Rather, the lodestar of petitioner's eminent domain power is the public project authorized by the certificate (see Transportation Corporations Law § 83). The certificate, in other words, simply authorizes the public project, and the power of eminent domain stands or falls with that project as a necessary ancillary to its implementation (see generally NY Const, art 1, § 7 [a]). Thus, when the public project cannot be legally completed, any eminent domain [*5]power in connection with that project is necessarily extinguished [FN3]. To say otherwise would effectively give a condemnor the power to condemn land in the absence of a public project, and that would violate the plain text of the State Constitution.
Finally, the fact that respondents might be adequately compensated for their forced sale is entirely beside the point. As the owners of the land at issue, it is up to respondents — and respondents alone — whether or not to convey an interest in their property to petitioner. In a constitutional order such as ours, jealous as it is of the right to own property and do with it as one pleases, only a viable public project can force respondents to surrender their rights in their land. Here, given the State's WQC denial, there simply is no viable public project. Consequently, petitioner has no right to force respondents to sell something that is not for sale.
IV
At the end of the day, this seemingly complicated case can be explained in these straightforward terms: petitioner is trying to expropriate respondents' land in furtherance of a pipeline project that, as things currently stand, cannot legally be built. Such an effort turns the entire concept of eminent domain on its head. If the State's WQC denial is finally annulled or withdrawn, then petitioner can file a new vesting petition. But until that time, petitioner cannot commence a vesting proceeding to force a sale without going through the entire EDPL article 2 process. Accordingly, the order appealed from should be reversed and the petition dismissed. Respondents' remaining contentions are academic in light of our determination.
Curran and Winslow, JJ., concur with NeMoyer, J.;
Lindley, J., dissents and votes to affirm in the following opinion in which Carni, J.P., concurs: We respectfully dissent and would affirm. The majority concludes that the petition in this eminent domain proceeding should be dismissed because, "as things currently stand," the underlying public project, a natural gas pipeline, "cannot be lawfully constructed." The pipeline cannot lawfully be constructed, the reasoning goes, because the New York State Department of Environmental Conservation (DEC) has denied petitioner's application for a water quality certificate (WQC), the issuance of which is one of the many conditions that must be satisfied before petitioner can build the pipeline.
It is undisputed, however, that the Federal Energy Regulatory Commission (FERC) has determined, in an order issued August 6, 2018, that the DEC waived its WQC certification authority under section 401 of the Clean Water Act. Thus, as things now stand, the DEC's denial of the WQC is no longer an impediment to construction of the pipeline. Indeed, respondents-appellants (respondents) do not challenge petitioner's assertion in a post-argument submission that the project is "very much alive." Yet the majority concludes that petitioner cannot obtain an easement over respondents' property because the project is dead.
The majority's determination that the project is dead is based on its refusal to take judicial notice of the August FERC order on grounds that it is not final inasmuch as it is subject to a rehearing and appeal to federal court. But the August FERC order is binding unless and until it is vacated or overturned on appeal (see 15 USC § 3416 [a] [4]), and it is no less final than the DEC's denial of the WQC, which has been appealed by petitioner to the Second Circuit Court of Appeals. As noted, the majority relies on the DEC's denial of the WQC to conclude that the pipeline will not be built and that petitioner therefore no longer has "a valid and operative" certificate of public convenience and necessity from the FERC.
Even if we were to ignore the most recent FERC order, the DEC's denial of the WQC does necessarily not mean that petitioner cannot build the pipeline. As respondents recognize in their post-argument submission, petitioner could obtain the WQC by mitigating environmental concerns expressed by the DEC. For instance, petitioner could use horizontal directional drilling (HDD) to cross various streams, as proposed by the DEC, or it could alter the path of the pipeline to avoid the streams. Although petitioner has stated that using HDD technology is too expensive for its liking, the seminal point here is that the DEC's decision does not vitiate the certificate of public convenience and necessity issued by the FERC, nor does it sound the death knell of the pipeline project.
In any event, although the issuance of a WQC by the DEC is a condition that must be met prior to construction of the pipeline, it is not, in our view, a condition precedent to the commencement of this eminent domain proceeding (see Constitution Pipeline Co., LLC v A Permanent Easement for 0.42 Acres and Temporary Easements for 0.46 Acres, in Schoharie County, New York, 2015 WL 12556145, *2 [ND NY, Apr. 17, 2015]). The Natural Gas Act (NGA) grants private natural-gas companies the power to acquire property by eminent domain. A natural gas company may build and operate a new pipeline if it obtains a certificate of public convenience and necessity from the FERC. Here, petitioner's proposed pipeline is authorized by a FERC order issued on February 3, 2017, which includes a certificate of public convenience and necessity for the pipeline. As the majority points out, the FERC order is subject to various conditions, one of which requires petitioner to obtain "all applicable authorizations required under federal law." That condition has reasonably been construed as obligating petitioner to obtain a WQC from the DEC prior to building the pipeline.
There are, however, various other conditions in the authorizing FERC order, many of which cannot be met until after petitioner has obtained possession of the rights of way for the pipeline. If petitioner is prohibited from exercising its eminent domain authority until it satisfies all of the conditions of the FERC order, as the majority holds, the pipeline can never be built (see Constitution Pipeline Co., LLC, 2015 WL 12556145, *2).
Finally, we note that the FERC has clearly and unambiguously stated that the conditions in its initial order need not be satisfied prior to petitioner commencing a taking proceeding under the eminent domain law. Paragraph 22 of the recent FERC order states that "it is Congress, speaking directly in NGA section 7 (h), that authorized a certificate-holder to exercise eminent domain authority to acquire land or other property necessary to construct or operate the approved facilities if the certificate-holder cannot acquire such property by agreement with the owner. Congress did not establish any prerequisite for eminent domain authority beyond the Commission's decision to issue the certificate" (emphasis added).
The FERC's interpretation of its own order is consistent with federal case law. As the Fourth Circuit Court of Appeals has explained, "[o]nce FERC has issued a certificate, the NGA empowers the certificate holder to exercise the right of eminent domain' over any lands needed for the project" (East Tenn. Nat. Gas Co. v Sage, 361 F3d 808, 818 [4th Cir 2004], quoting 15 USC § 717f [h]). Respondents and the majority cite no authority for the proposition that the [*6]conditions in the FERC order are conditions precedent to petitioner's exercise of its eminent domain authority, and we could find none. We thus conclude that there is no basis to reverse Supreme Court's order, which grants petitioner easements over respondents' land.
Entered: November 9, 2018
Mark W. Bennett
Clerk of the Court



Footnotes

Footnote 1: Contrary to the dissent's intimations, federal law confers no broader right to eminent domain than does state law. In fact, the relevant federal eminent domain statute explicitly provides that "any action or proceeding for [eminent domain to build a pipeline] in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated" (15 USC § 717f [h]). "[State] law, therefore, controls the issues in this case" regarding petitioner's entitlement to eminent domain (Tennessee Gas Pipeline Co. v 104 Acres of Land More or Less, in Providence County of State of R.I., 780 F Supp 82, 85 [D RI 1991] [applying Rhode Island law in federal condemnation proceeding under section 717f (h)], citing, inter alia, Mississippi River Transmission Corp. v Tabor, 757 F2d 662, 665 n 3 [5th Cir 1985] [applying Louisiana law in federal condemnation proceeding under section 717f (h)]).

Footnote 2: After this appeal was orally argued, the FERC apparently issued a new ruling that calls into question the timeliness of the State's WQC denial. That ruling is not final, however, and it is subject to administrative rehearing as well as to judicial review in either the Second Circuit or the DC Circuit (see 15 USC § 717r [a], [b]). Given its non-finality and the consequent "uncertainty as to [federal] law on this point," we decline to take judicial notice of the new FERC ruling (Babcock v Jackson, 17 AD2d 694, 701 [4th Dept 1962, Halpern, J., dissenting], revd 12 NY2d 473 [1963]; see Majestic Co. v Wender, 24 Misc 2d 1018, 1018-1019 [Sup Ct, Nassau County 1960, Meyer, J.]; see also Matter of Bach, 81 Misc 2d 479, 486-487 [Sur Ct, Dutchess County 1975], affd 53 AD2d 612 [2d Dept 1976]; Berger v Dynamic Imports, 51 Misc 2d 988, 989 [Civ Ct, NY County 1966]; see generally CPLR 4511; Matter of Warren v Miller, 132 AD3d 1352, 1354 [4th Dept 2015]).
The dissent faults us for disregarding the new FERC ruling because it is "no less final than the DEC's denial of the WQC." But the dissent overlooks a crucial distinction between the WQC denial and the new FERC ruling: the former is part of the appellate record and was before Supreme Court at the time of its determination; the latter is dehors the appellate record and did not exist when Supreme Court rendered its determination. It thus makes perfect sense to consider the WQC denial, but not the new FERC ruling, when reviewing the particular determination now before us. After all, our function is to decide whether Supreme Court properly granted the instant petition based on the record before it, not whether its determination could or should have been different had it been made under different circumstances with a different record. The dissent's ad hoc approach to intervening developments on appeal would effect a marked departure from longstanding norms of orderly procedure (see generally Rives v Bartlett, 215 NY 33, 39 [1915], rearg denied 215 NY 697 [1915]). Those norms carry particular weight here, where petitioner filed a vesting petition before it even knew whether it could actually build the underlying pipeline project. Flouting norms of orderly procedure by giving effect to the new FERC ruling in this appeal would effectively reward petitioner for its premature filing, and that we decline to do. If petitioner wants to argue that the new FERC ruling has revived the pipeline project, it is free to do so — in a new EDPL article 4 petition in Supreme Court.

Footnote 3: We are not bound by the unpublished case upon which petitioner and the dissent primarily rely, Constitution Pipeline Co., LLC v A Permanent Easement for 0.42 Acres and Temporary Easements for 0.46 Acres, in Schoharie County, New York (2015 WL 12556145 [ND NY, Apr. 17, 2015]). In any event, that case does not consider the dispositive issue of state law in this case, namely, whether a FERC certificate authorizing the construction of a pipeline "subject to" a particular condition constitutes a qualifying federal permit under EDPL 206 (A) upon the failure of that condition. Indeed, the District Court's analysis in Constitution Pipeline Co., LLC is not even grounded in the two-step process for condemnation set forth in the EDPL, and the dissent's insistence on deciding this state-law case by reference to inapplicable principles of federal law undercuts a key pillar of our system of cooperative federalism — the notion that state courts adjudicating proceedings under state law are bound "not by federal . . . requirements for an action brought under a federal statute . . . , but by this state's own requirements [and] controlling state cases" (Hammer v American Kennel Club, 304 AD2d 74, 80 [1st Dept 2003], affd 1 NY3d 294 [2003]; see Paramount Pictures Corp. v Allianz Risk Transfer AG, 31 NY3d 64, 81-82, 87 [2018, Rivera, J., concurring]). Tellingly, the dissent does not even engage with the dispositive issue of state law implicated by this appeal, i.e., whether petitioner qualified for an exemption under EDPL 206 (A) based on the record before Supreme Court.